734 So.2d 1038 (1999)
Walter L. STONE, etc., Appellant,
v.
Georgene WALL, et al., Appellees.
No. 92,499.
Supreme Court of Florida.
June 17, 1999.
*1039 Nathan D. Clark of Coral Reef Law Offices, P.A., Pinecrest, Florida, for Appellant.
Stephen Marc Slepin of Slepin & Slepin, Tallahassee, Florida, and Robert P. Frankel of Lapidus & Frankel, P.A., Miami, Florida, for Appellees.
PARIENTE, J.
This matter is before the Court for consideration of the following question certified by the United States Court of Appeals for the Eleventh Circuit:
WHETHER A CAUSE OF ACTION EXISTS FOR INTERFERENCE WITH THE PARENT/CHILD RELATIONSHIP WHERE A THIRD PARTY (THAT IS, A NONPARENT WHO HAS NO CUSTODY RIGHTS OVER THAT CHILD) INTENTIONALLY ABDUCTS A MINOR CHILD FROM A PARENT LEGALLY ENTITLED TO THE CHILD'S CUSTODY.
Stone v. Wall, 135 F.3d 1438, 1443 (11th Cir.1998). We have jurisdiction. See art. V, § 3(b)(6), Fla. Const. We answer the question, as narrowly framed, in the affirmative.

BACKGROUND
Appellant, Walter Stone, is the parent and natural guardian of S.P.S., his minor child. Stone filed this diversity action in federal district court on his behalf and on the behalf of S.P.S. for interference with a custodial parent-child relationship and abduction by a third party. The appellees are Georgeanne Wall, S.P.S.'s maternal grandmother; Gina Wall Masterson, S.P.S.'s maternal aunt; and Brock Green, attorney for Wall and Masterson.[1]
The narrow issue we confront is whether Florida should recognize a common law cause of action for intentional interference with a custodial parent-child relationship or abduction of a child by a third party who has no custody rights over the child. Because this case comes to us on a motion to dismiss, we must accept the well-pleaded factual allegations of the complaint as true. See Londono v. Turkey Creek, Inc., 609 So.2d 14, 18-19 (Fla.1992).
According to the allegations in Stone's first amended complaint, Wall, Masterson and Green conspired to interfere with *1040 Stone's right of custody of his minor child. Stone and Gwen Lindgren, the parents of S.P.S., were formerly married. After Stone and Lindgren divorced, Stone exercised "parental responsibility and custody rights." The pertinent additional factual allegations are set forth in the Eleventh Circuit's opinion:
In 1987 Stone and Lindgren were divorced in Virginia. In 1994, Stone exercised his visitation rights with S.P.S. at his home in Mississippi. Stone says that he then was informed by his ex-wife, Lindgren, that she had been diagnosed with brain cancer and was not expected to live more than six months. At Lindgren's request, Stone allowed the child to return to Virginia and to stay with Lindgren, for Lindgren's final days. Plaintiffs further allege that, when Stone returned with S.P.S. to Virginia, Wall asked about Stone's plans for the custody of S.P.S. upon the death of Lindgren. Wall said that she desired that custody of the child be given to Masterson. Stone informed Wall that he would take full custody of S.P.S. and live in Mississippi.
Plaintiffs allege that Defendants Green, Wall, and Masterson acted with intent to interfere with Stone's custody of S.P.S. In addition, Defendants conspired, in Florida, to remove S.P.S. from Virginia to Colorado without the consent of Stone, who was the parent and natural guardian of S.P.S. According to the Complaint, Defendants (1) removed the child from Virginia before the death of her mother; (2) refused to respond to Stone's inquiries about the whereabouts of his child; (3) executed a guardianship/entrustment agreement without the knowledge and consent of Stone[[2]]; (4) concealed the guardianship agreement from Stone; (5) continued to conceal the child, who Stone located only by his own efforts; and (6) refused to return the child to Stone despite repeated requests and despite Stone's status as the natural guardian legally entitled to custody of the child.
Stone, 135 F.3d at 1440.
In order to locate his child, Stone hired attorneys in both Virginia and Colorado and incurred "travel costs, investigative costs and other costs" associated with locating and returning S.P.S. to his custody. After locating his child in Colorado, Stone took physical custody of her with the knowledge and consent of the Federal Bureau of Investigation, the Commonwealth Attorney in Virginia, and the Cherry Hills, Colorado, Police Department. See id. at 1440 n. 1.
The federal district court dismissed Stone's complaint, concluding that Stone failed to state a claim upon which relief could be granted and that even if a claim had been stated, the family law nature of the case warranted abstention. See id. at 1440. The Eleventh Circuit reversed the district court, finding that abstention was not warranted because the complaint was for the recovery of money damages arising from an alleged tort. See id. at 1441. The Eleventh Circuit also concluded that Florida law was applicable.[3]See id. However, because there was no precedent from this Court to assist in determining whether a cause of action exists for Stone's claims, *1041 the Eleventh Circuit certified the question on review as requiring resolution by this Court. See Stone, 135 F.3d at 1443.

ANALYSIS OF THE PROPOSED CAUSE OF ACTION
A cause of action for interference with a custodial parent-child relationship has its roots in English common law, descended from a writ giving the father an action for the abduction of his heir. See Pickle v. Page, 252 N.Y. 474, 169 N.E. 650, 651 (1930); W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 124, at 924 (5th ed.1984); see also Murphy v. I.S.K. Con. of New England, Inc., 409 Mass. 842, 571 N.E.2d 340, 351 (1991). The writ was based in trespass, and the father's property interest in his heir was the legal theory supporting the writ. See Pickle, 169 N.E. at 651 (citing Barham v. Dennis, 78 Eng. Rep. 1001 (K.B.1600)); Keeton, supra § 124, at 924. The claim was eventually extended to the abduction of any child for whom the father could show lost services. See Pickle, 169 N.E. at 651; Keeton, supra § 124, at 924. With few exceptions, the mother could not bring the action because the mother had no property rights in the child. See Keeton, supra § 124, at 924.
Since at least the mid-1800's, American courts have allowed parents to sue child kidnappers. See Rice v. Nickerson, 91 Mass. (9 Allen) 478 (1864); Magee v. Holland, 27 N.J.L. 86, 88 (N.J.Sup.Ct.1858); Clark v. Bayer, 32 Ohio St. 299, 301 (1877). By the turn of this century, American courts had discarded, as an "outworn fiction," the requirement of loss of services as the foundation for the tort. Howell v. Howell, 162 N.C. 283, 78 S.E. 222, 224 (1913). As the Pickle court observed,
[i]t would be a reproach to our legal system if, for the abduction of a child in arms, no remedy ran to its parent, although `for a parrot, a popinjay, a thrush' and even `for a dog' an ample remedy is furnished to their custodian for the loss of their possession.
Pickle, 169 N.E. at 653 (quoting Barham, 78 Eng. Rep. at 1001, which refused to recognize a cause of action for abduction of a child other than an heir because the father had no "property or interest" in his non-heirs).
Most often referred to as "interference with child custody"[4] or "intentional abduction of a child" or by some other version of such terms,[5] this cause of action has been the subject of recent scholarly discussion. However, as early as 1938, the tort was included in the American Law Institute's first Restatement of Torts. See Restatement of Torts, § 700 (1938). The most recent version, Restatement of Torts (Second) § 700 (1977), provides the common law cause of action with its contemporary definition:
One who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after *1042 it has been left him, is subject to liability to the parent.
In its twentieth-century form, the action may be brought by either parent, and loss of services is no longer always a predicate to recovery. See, e.g., Pickle, 169 N.E. at 652-53; Keeton, supra, § 124. This more modern view recognizes that the tort serves to protect the parent-child relationship. See Keeton, supra, § 124, at 924-25.
The elements of the cause of action include that the plaintiff had superior custody rights to the child and that the defendant intentionally interfered with those rights. See Restatement (Second) of Torts, § 700 cmt. c. The Supreme Court of West Virginia recently elaborated on the elements by holding that a prima facie case for tortious interference requires a showing that:
(1) the complaining parent has a right to establish or maintain a parental or custodial relationship with his/her minor child; (2) a party outside of the relationship between the complaining parent and his/her child intentionally interfered with the complaining parent's parental or custodial relationship with his/her child by removing or detaining the child from returning to the complaining parent, without that parent's consent, or by otherwise preventing the complaining parent from exercising his/her parental or custodial rights; (3) the outside party's intentional interference caused harm to the complaining parent's parental or custodial relationship with his/her child; and (4) damages resulted from such interference.
Kessel v. Leavitt, 204 W.Va. 95, 511 S.E.2d 720, 765-66 (1998), cert. denied, ___ U.S. ___, 119 S.Ct. 1035, 143 L.Ed.2d 43 (1999). Similarly, the Alabama Supreme Court has held that:
To state a claim of intentional or malicious custodial interference, a plaintiff need only plead facts tending to show:
"(1) [S]ome active or affirmative effort by [the] defendant to detract the child from the parent's custody or service, (2) [that] the enticing or harboring [was] willful, [and] (3) [that the enticing or harboring was done] with notice or knowledge that the child had a parent whose rights were thereby invaded."
Anonymous v. Anonymous, 672 So.2d 787, 790 (Ala.1995) (quoting 67A C.J.S. Parent & Child § 131 (1978)). It is a defense to the cause of action that the plaintiff did not have superior custodial rights, that the defendant took the child to prevent physical harm to the child, or that the defendant "possessed a reasonable, good faith belief that the interference was proper." Kessel, 511 S.E.2d at 766.
The majority of states considering the question have recognized a cause of action for intentional interference with the custodial parent-child relationship.[6] Courts *1043 have recognized this tort in a variety of circumstances, ranging from a parent suing the noncustodial parent or grandparent to a parent suing a hospital, religious organization, or the minor child's boyfriend. See, e.g., Anonymous, 672 So.2d at 788 (parents suing their daughter's boyfriend and his parents); D & D Fuller CATV Constr., Inc. v. Pace, 780 P.2d 520 (Colo. 1989) (mother suing grandparents for conspiring with father to conceal child's whereabouts); Shields v. Martin, 109 Idaho 132, 706 P.2d 21 (1985) (father suing mother and police department for abduction); Wood v. Wood, 338 N.W.2d 123 (Iowa 1983) (mother suing father); Spencer v. Terebelo, 373 So.2d 200 (La.Ct.App. 1979) (father suing mother); Murphy v. I.S.K. Con. of New England, Inc., 409 Mass. 842, 571 N.E.2d 340, 342 (1991) (minor and minor's mother suing religious organization); Kramer v. Leineweber, 642 S.W.2d 364 (Mo.Ct.App.1982) (mother suing father and grandmother); Plante v. Engel, 124 N.H. 213, 469 A.2d 1299 (1983) (father suing grandparents for aiding and abetting mother in interfering with custodial relationship); McGrady v. Rosenbaum, 62 Misc.2d 182, 308 N.Y.S.2d 181 (Sup.Ct.1970) (father suing mother and maternal grandparents), aff'd, 37 A.D.2d 917, 324 N.Y.S.2d 876 (1971); McBride v. Magnuson, 282 Or. 433, 578 P.2d 1259 (1978) (mother suing police officer); Bedard v. Notre Dame Hosp., 89 R.I. 195, 151 A.2d 690 (1959) (mother suing hospital); Silcott v. Oglesby, 721 S.W.2d 290 (Tex.1986) (father suing son's maternal grandfather); Kessel, 511 S.E.2d at 720 (father suing child's mother, and the mother's parents).

RECOGNITION OF COMMON LAW TORTS IN FLORIDA
Whether a common law cause of action for tortious interference with a custodial parent-child relationship should be judicially recognized in Florida is a question of first impression. This State has adopted the common law of England as it existed on July 4, 1776, to the extent that it is not inconsistent with the statutes and constitutions of Florida and the United States. See § 2.01, Fla. Stat. (1997); State ex rel. Clayton v. Board of Regents, 635 So.2d 937, 937 (Fla.1994). We have explained that "[a]ll rules of the common law are designed for application to new conditions and circumstances," and we "exercise a `broad discretion' taking `into account the changes in our social and economic customs and present day conceptions of right and justice.'" Hoffman v. Jones, 280 So.2d 431, 435-36 (Fla.1973) (quoting Duval v. Thomas, 114 So.2d 791, 795 (Fla. 1959)). "[C]ontemporary conditions must be met with contemporary standards which are realistic and better calculated to obtain justice among all the parties involved." Id. at 436. Therefore, the common law "`must keep pace with changes in our society,'" and to that end "may be altered when the reason for the rule of law ceases to exist, or when change is demanded by public necessity or required to vindicate fundamental rights." United States *1044 v. Dempsey, 635 So.2d 961, 964 (Fla.1994) (footnote omitted) (citations omitted) (quoting Gates v. Foley, 247 So.2d 40, 43 (Fla.1971)).
As indicated, the tort of intentional interference with the custodial parent-child relationship has its origins in English common law and is derived from a cause of action for the abduction of the father's heir. See Pickle, 169 N.E. at 652-53; Barham, 78 Eng. Rep. at 1001; Keeton, supra, at § 124. The tort has evolved significantly since 1600 so that in its contemporary version either custodial parent may recover, the child does not have to be the heir, and recovery is not predicated on loss of services but on the sanctity of the parent-child relationship.
It would be violative of constitutional equal protection issues not to recognize the equal rights of both parents in allowing either a cause of action or an element of damages. See Gates, 247 So.2d at 43. Additionally, outdated common law principles based on the view that children are nothing more than the economic assets of their parents have likewise been replaced with a more enlightened and realistic view of the role of children in their parents' lives. See Dempsey, 635 So.2d at 964. Thus, the cause of action for interference with a custodial parent-child relationship is a natural progression of the common law with due regard for constitutional principles, changes in our social and economic customs, and "present day conceptions of right and justice." Hoffman, 280 So.2d at 435.
Further, this Court has consistently recognized that the parent-child relationship has fundamental constitutional significance. See, e.g., Von Eiff v. Azicri, 720 So.2d 510, 513 (Fla.1998). Tort law has long protected "relational" interests, such as those between family members, from interference. See Keeton, supra, § 124, at 915. In Wilkie v. Roberts, 91 Fla. 1064, 1068, 109 So. 225, 227 (1926), this Court held that a wrongful injury to the child gave rise to a common law cause of action by the father for his losses, reasoning that a father's right to the custody, companionship, services and earnings of his minor child are valuable rights. In Yordon v. Savage, 279 So.2d 844, 846 (Fla.1973), this Court acknowledged that this right to recover damages, including those for the loss of companionship and society, resulting from a wrongful injury to the child extended to both parents. In Dempsey, this Court reaffirmed our holdings in Wilkie and Yordon, reiterating the policy that familial relationships are to be protected and recovery allowed for losses resulting from wrongful injuries that adversely affect those relationships. Dempsey, 635 So.2d at 964-65.
In addition, the recognition of torts for intentional interference is certainly not a novel legal concept in Florida common law. For example, this Court has recognized the tort of intentional infliction of emotional distress. See Metropolitan Life Ins. Co. v. McCarson, 467 So.2d 277, 278 (Fla. 1985). Likewise, this Court has recognized a cause of action for intentional and tortious interference with a business relationship. See, e.g., Gossard v. Adia Servs., Inc., 723 So.2d 182, 183 (Fla.1998); United Yacht Brokers, Inc. v. Gillespie, 377 So.2d 668, 672 (Fla.1979).
The tort of intentional interference with business relationships is recognized because "economic relations are entitled to freedom from unreasonable interference." United Yacht, 377 So.2d at 672. We find that the parental custodial relationship should be entitled to no less legally recognized protection from unreasonable interference, especially given the fundamental constitutional significance of the parent-child relationship.

WHETHER ANY STATUTES PRECLUDE RECOGNITION OF THIS CAUSE OF ACTION
We also find that recognition of this cause of action does not conflict with any existing statutes. In fact, this civil *1045 cause of action is consistent with the criminal statutory prohibition against "interference with custody," which is generally classified as a third degree felony. § 787.03, Fla. Stat. (1997). This statute prohibits a person, without lawful authority, from knowingly or recklessly interfering with the lawful custody of a child seventeen years of age, or younger. See id.
The fact that the Legislature does not also provide a civil remedy in its criminal statutes is not dispositive because the recognition of a common law tort, which is not inconsistent with our statutes and Constitution, falls within the judicial domain. This Court has consistently stated that we are not prevented from recognizing a cause of action simply because the legislature has not created it. See Dempsey, 635 So.2d at 964; Zorzos v. Rosen, 467 So.2d 305, 307 (Fla.1985); Wilkie, 91 Fla. at 1068, 109 So. at 227.
We therefore reject the appellees' reliance on Mantooth v. Richards, 557 So.2d 646 (Fla. 4th DCA 1990), because the complaint in Mantooth did not allege a common law cause of action based on abduction or tortious interference with custody. Instead, the father sought money damages in a civil action under the specific authority of sections 772.102(1)(a)(12), 772.103, 772.104 and 787.01, Florida Statutes (1987), pertaining to the kidnapping of a minor. The Fourth District concluded that there was no civil remedy for the violation of these statutes. See Mantooth, 557 So.2d at 646.
We also disagree that the statutory abolition of an action for alienation of affections precludes a cause of action for intentional interference with the parent-child relationship.[7] As the Restatement of Torts recognizes, the causes of action for alienation of affections and the intentional interference with the custodial parent-child relationship are two separate torts. See Restatement (Second) of Torts §§ 699, 700 (1977). Like Florida and the other jurisdictions that have abolished cause of actions for alienation of affections, see § 771.01, Fla. Stat. (1997); Prosser, supra § 124, at 930, the Restatement specifically rejects a cause of action for alienation of a child's affections. See Restatement (Second) of Torts § 699 ("One who, without more, alienates from its parent the affections of a child, whether a minor or of full age, is not liable to the child's parent."). Nonetheless, the Restatement specifically recognizes a cause of action for intentional interference with the custodial parent-child relationship in section 700.
As explained by West Virginia's highest court, unlike the tort of alienation of affections, which merely requires allegations of an interference with the child's affections,
"[t]ortious interference with parental or custodial relationship" intimates that the complaining parent has been deprived of his/her parental or custodial rights; in other words, but for the tortious interference, the complaining parent would be able to exercise some measure of control over his/her child's care, rearing, safety, well-being, etc. By contrast, "alienation of affections" connotes only that the parent is not able to enjoy the company of his/her child; this cause of action does not suggest that the offending party has removed parental or custodial authority from the complaining parent.
Kessel, 511 S.E.2d at 761 n. 44; see also Murphy, 571 N.E.2d at 351 (finding tort of intentional interference with custodial relationship requires physical absence of child from home, distinguishing the tort from alienation of affections); Keeton, supra, § 124, at 930.
*1046 Because of the important distinction between these two torts, Florida's statutory abolition of the tort of alienation of affections does not preclude our recognition of a cause of action for intentional interference with the custodial parent-child relationship. We thus disagree with the Eleventh Circuit's reasoning in McDougald v. Jenson, 786 F.2d 1465 (11th Cir.1986). In McDougald, the Eleventh Circuit considered, among other claims, the father's counterclaim for tort damages based on the "surreptitious removal" of his son from Florida by his son's mother and grandmother. The Eleventh Circuit opined that because the Florida legislature abolished the cause of action for alienation of affections, based on the policy that "domestic quarrels-who did what to whom before and during a marriage-should not be the subject of damage suits and jury trials," this State would not recognize the right of action, based on similar policy concerns. McDougald, 786 F.2d at 1489-90 (quoting Mims v. Mims, 305 So.2d 787, 789 (Fla. 4th DCA 1974)).
While we disagree with McDougald's reasoning regarding the effect of the abolition of the tort of alienation of affections, we do not decide whether we also disagree with the result in that case because McDougald involved an action by one parent against the other parent. Clearly, in the instant case the Eleventh Circuit did not consider its opinion in McDougald dispositive because it certified the question without reference to McDougald. See Stone, 135 F.3d at 1443.

COMPETING POLICY CONSIDERATIONS
We lastly address whether there are any contrary policy considerations that would preclude our recognition of this cause of action.[8] We do not find that a consideration of the best interests of the children militates against recognition of this common law tort, especially given the narrow question posed by the Eleventh Circuit. Against the overwhelming weight of judicial authority, the Minnesota Supreme Court in Larson decided against recognizing this cause of action based on policy considerations.[9] 460 N.W.2d at 45-47. The majority's concern focused on the possibility of increased litigation in child custody matters and the danger that the tort might escalate intra-family disputes. See id. at 45-46; see also Zaharias v. Gammill, 844 P.2d 137 (Okla.1992) (disapproving tort as not in the child's best interests).
To the contrary, the dissent in Larson concluded that recognizing the tort does further the child's best interests by "encouraging the return of absent children by imposing a civil damages remedy." 460 N.W.2d at 52 (Popovich, C.J., dissenting). Like the dissent in Larson, we note the alarming statistics regarding the ever-increasing number of child kidnappings by those who do not have a superior claim to legal custody of the child. See id. at 48 (Popovich, C.J., dissenting); Joseph R. Hillebrand, Note, Parental Kidnapping and the Tort of Custodial Interference: Not in a Child's Best Interests, 25 Ind. L.Rev. 893, 894 (1991).
It is obviously in the best interests of children to be returned promptly to their legal custodians. As expressed by the Iowa Supreme Court:
A tort suit will be more likely to effect a speedy return of the child; it will result in better cooperation by potential third-party defendants seeking to avoid the *1047 suit; potential punitive damages will serve as an additional deterrent; and increased knowledge of a child's whereabouts will result through the broad scope of civil-case discovery.
Wood, 338 N.W.2d at 127 (citing Patricia Hoff,[10]Interstate Child Custody Disputes and Parental Kidnapping: Policy, Practice and Law 14-1 (1982)); see D & D Fuller, 780 P.2d at 524. Therefore, we agree with the dissent in Larson and the weight of judicial authority that, if anything, the best interests of children would be furthered by recognizing this cause of action.
While the courts must be constantly vigilant to guard against the misuse of the legal process, those who would bypass the legal system by taking children from those who have a superior right to legal custody cause a far greater affront to our system of justice. Such conduct has the potential for causing far greater harm to the children than litigation. It is this conduct that causes the real harm that the tort is designed to redress, including substantial expenses incurred by a parent in having the child returned.[11] As articulately expressed by the dissent in Larson:
If one principle stands paramount in our system of jurisprudence, it is that no one person, mother, father, president or pauper stands above the law. In a case as this, the best interests of the child must be considered together with respect for our legal system.
460 N.W.2d at 52-53 (Popovich, C.J., dissenting).

CONCLUSION
It is our responsibility to adapt the common law to accommodate principles of justice, reason and common sense. We find that present day conceptions of right and justice compel us to join the overwhelming majority of jurisdictions that have, through decisional law, recognized this common law tort.
However, in this case, we answer only the narrow question posed by the Eleventh Circuit by giving judicial recognition in Florida to the common law cause of action for intentional interference with the custodial parent-child relationship by a third party non-parent. We accordingly answer the certified question in the affirmative.
It is so ordered.
HARDING, C.J., and WELLS and ANSTEAD, JJ., concur.
SHAW, J., recused.
OVERTON, Senior Justice, dissents with an opinion.
OVERTON, Senior Justice, dissenting.
I dissent. There are no winners as a result of the majority decision except the beneficiaries of the fees generated by these proceedings. In my view, the children in these types of proceedings are very likely to be even more the losers than they are now. I fully agree with the majority view expressed by the Minnesota Supreme Court in Larson v. Dunn, 460 N.W.2d 39 (Minn.1990). I also totally *1048 agree with the analysis of the United States Court of Appeals for the Eleventh Circuit in McDougald v. Jenson, 786 F.2d 1465 (11th Cir.1986), particularly its reasoning that because the Florida Legislature abolished the cause of action for alienation of affections, based on an express legislative policy decision that "domestic quarrelswho did what to whom before and during a marriageshould not be the subject of damage suits in jury trials," that Florida would not recognize the right to a tort action such as the one in question here, based upon similar policy concerns. Id. at 1489-91; see Majority op. at 1046.
My view does not mean there should not be a remedy. My view is that the remedy should be in one family court. Multiple suits regarding intrafamily disputes in multiple courts do nothing but reduce substantially the family resources that could be available for the support and education of the children who are involved. In considering this policy determination, this Court should be focusing on who will be the beneficiaries of this tort action. This is not the type of action that is going to be covered by insurance. The place where these types of issues need to be resolved is in one family court proceeding, not multiple proceedings and not in proceedings where invariably this type of action will be used as a bargaining chip for matters that are in the family court's jurisdiction. This Court should not allow that to occur, particularly when the legislature has previously set a policy against these types of intrafamily disputes being heard in the tort arena.
NOTES
[1] Wall is a resident of Florida. The complaint alleges that Masterson was a resident of Florida in 1994 and that both Masterson and Green committed tortious acts or engaged in activities within the State of Florida. Because the motion to dismiss was granted based on the failure to state a cause of action, the federal district court never resolved the propriety of personal jurisdiction over Masterson and Green, the Eleventh Circuit did not address this issue, and we likewise do not address this issue.
[2] The validity and "legal efficacy" of the entrustment agreement, which Stone alleges is null and void, is not before us nor was it addressed by the Eleventh Circuit. See Stone v. Wall, 135 F.3d 1438, 1441 n. 2 (11th Cir. 1998).
[3] According to the record, Stone alleged the application of Virginia law in a motion to vacate judgment after the trial court had dismissed the case. Because the application of foreign law was not pleaded prior to dismissal, the Eleventh Circuit concluded that Stone had waived the application of Virginia law and that Florida law must apply. See Stone, 135 F.3d at 1441-42 (citing Collins v. Collins, 160 Fla. 732, 36 So.2d 417 (1948)). By our decision, we do not express an opinion as to whether under the "significant relationships" test enunciated in Bishop v. Florida Specialty Paint Co., 389 So.2d 999, 1001 (Fla.1980), Virginia law would apply if the application of Virginia law were properly pleaded.
[4] See, e.g., Joy M. Feinberg & Lori Loeb, Custody and Visitation Interference: Alternative Remedies, 12 J. Am. Acad. Matrimonial Law. 271, 278-79 (1994) (interference with custodial rights); Michael K. Steenson, The Anatomy of Emotional Distress Claims in Minnesota, 19 Wm. Mitchell L.Rev. 1 (1993) (interference with the custodial relationship); Sue T. Bentch, Comment, Court-Sponsored Custody Mediation to Prevent Parental Kidnapping: A Disarmament Proposal, 18 St. Mary's L.J. 361, 380 (1986) (tortious interference with custody); Greg Geisman, Comment, Strengthening the Weak Link in the Family Law Chain: Child Support and Visitation as Complementary Activities, 38 S.D. L.Rev. 568, 598-99 (1992/93) (interference with visitation rights).
[5] See, e.g., Susan J.G. Alexander, A Fairer Hand: Why Courts Must Recognize the Value of a Child's Companionship, 8 T.M. Cooley L.Rev. 273, 278-86 (1991) (loss of a child's companionship due to intentional interference); Mark L. Johnson, Note, Compensating Parents for the Loss of Their Nonfatally Injured Child's Society: Extending the Notion of Consortium to the Filial Relationship, 1989 U. Ill. L.Rev. 761, 767-68 (intentional abduction of a child).
[6] Sixteen state supreme courts have recognized the tort of intentional interference with the custodial relationship or abduction: Anonymous v. Anonymous, 672 So.2d 787 (Ala.1995); Borer v. American Airlines, 19 Cal.3d 441, 138 Cal.Rptr. 302, 563 P.2d 858, 865 n. 3 (1977); D & D Fuller CATV Constr., Inc. v. Pace, 780 P.2d 520 (Colo.1989); Shields v. Martin, 109 Idaho 132, 706 P.2d 21 (1985); Montgomery v. Crum, 199 Ind. 660, 161 N.E. 251 (1928); Wood v. Wood, 338 N.W.2d 123 (Iowa 1983); Murphy v. I.S.K. Con. of New England, Inc., 409 Mass. 842, 571 N.E.2d 340 (1991); Brown v. Brown, 338 Mich. 492, 61 N.W.2d 656 (1953); Plante v. Engel, 124 N.H. 213, 469 A.2d 1299 (1983); Howell v. Howell, 162 N.C. 283, 78 S.E. 222 (1913); Pickle v. Page, 252 N.Y. 474, 169 N.E. 650 (1930); Clark v. Bayer, 32 Ohio St. 299 (1877); McBride v. Magnuson, 282 Or. 433, 578 P.2d 1259 (1978); Bedard v. Notre Dame Hosp., 89 R.I. 195, 151 A.2d 690 (1959); Silcott v. Oglesby, 721 S.W.2d 290 (Tex.1986); Kessel v. Leavitt, 204 W.Va. 95, 511 S.E.2d 720 (1998), cert. denied, ___ U.S. ___, 119 S.Ct. 1035, 143 L.Ed.2d 43 (1999). Two other state supreme courts have implied that they would have recognized this cause of action if the question were properly before them. See Marshak v. Marshak, 226 Conn. 652, 628 A.2d 964 (1993); Finn v. Lipman, 526 A.2d 1380 (Me.1987). In addition, an intermediate appellate court in at least two other states have approved the tort: Mathews v. Murray, 101 Ga.App. 216, 113 S.E.2d 232 (1960); Spencer v. Terebelo, 373 So.2d 200 (La.Ct.App.1979); see also Kristin A. Wentzel, Note, In the Best Interests of the Child? Minnesota's Refusal to Recognize the Tort of Intentional Interference with Custodial Rights, 14 Hamline L.Rev. 257, 265 n. 83 (1990) (courts in 23 states and the District of Columbia have recognized this tort).

Two state supreme courts have refused to recognize a claim for tortious interference with the custodial parent-child relationship based upon their concern that tort recovery and its accompanying litigation would be detrimental to the best interests of the child. See Larson v. Dunn, 460 N.W.2d 39 (Minn.1990); Zaharias v. Gammill, 844 P.2d 137 (Okla. 1992); see also Cosner v. Ridinger, 882 P.2d 1243 (Wyo.1994) (implying that it would reject tort if it were properly before the court). In two other states, Illinois and Missouri, there is a split in authority in the intermediate-level appellate courts regarding whether the cause of action should be recognized. Compare Whitehorse v. Critchfield, 144 Ill. App.3d 192, 98 Ill.Dec. 621, 494 N.E.2d 743 (1986) with Dymek v. Nyquist, 128 Ill.App.3d 859, 83 Ill.Dec. 52, 469 N.E.2d 659 (1984); compare Politte v. Politte, 727 S.W.2d 198 (Mo.Ct.App.1987) with Kramer v. Leineweber, 642 S.W.2d 364 (Mo.Ct.App.1982).
[7] The Florida legislature abolished common law causes of action for alienation of affections, criminal conversation, seduction, and breach of contract to marry in 1945 because the actions had been the subject of exploitation, blackmail, fraud, and other unlawful purposes. See ch. 23138, § 1 Laws of Florida (1945) (now codified at section 771.01, Florida Statutes (1997)); Liappas v. Augoustis, 47 So.2d 582 (Fla.1950); Rotwein v. Gersten, 160 Fla. 736, 36 So.2d 419 (Fla.1948).
[8] Compare Joseph R. Hillebrand, Note, Parental Kidnapping and the Tort of Custodial Interference: Not in a Child's Best Interests, 25 Ind. L.Rev. 893 (1991) with Wentzel, supra note 6.
[9] In rejecting the tort, the Minnesota Supreme Court went against the great weight of authority because all the state supreme courts considering this issue had previously recognized the cause of action for intentional interference with the custodial parent-child relationship. See supra note 6; Daniel Oberdorfer, Comment, Larson v. Dunn: Toward a Reasoned Response to Parental Kidnapping, 75 Minn. L.Rev. 1701, 1701-02 & n. 11 (1991).
[10] Patricia M. Hoff, who is the "director of the Child Custody Project, National Legal Resource Center for Child Advocacy and Protection of the American Bar Association," has written in favor of recognizing this tort. Wood, 338 N.W.2d at 126.
[11] Justice Overton's dissent does not explain what family court would have jurisdiction over the parties in this case or what remedy a family court could provide where the third parties are not subject to the jurisdiction of the family court and there is no contempt order to be enforced. Further, any remedy is likely to be incomplete. We note that Florida's version of the Uniform Child Custody Jurisdiction Act concerns which state can properly exercise jurisdiction over a custody matter but does not provide compensation for damages resulting from intentional interference with child custody. See §§ 61.1302.1348, Fla. Stat. (1997); cf. § 61.13(4)(c) (providing certain remedies for noncustodial parent when custodial parent interferes with visitation); accord Wood, 338 N.W.2d at 126; Larson, 460 N.W.2d at 48-49 (Popovich, C.J., dissenting); see generally Hillebrand, supra note 8.